UNITED STATES v. A. J. TAYLOR OF SANTA FE, NEW MEXICO (No. 5022)[1]

United States Court of Customs and Patent Appeals, February 6, 1961

*George Cochran Doub*, Assistant Attorney General, and *Richard E. FitzGibbon*, Chief, Customs Section, for the United States.

*Stein and Shostak* (*Marjorie M. Shostak*, of counsel) for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

MARTIN, Judge, delivered the opinion of the court:

This appeal is from the judgment of the United States Customs Court, First Division, C.D. 2128, one judge dissenting, which sustained the importer's protest and held certain merchandise consisting of footwear to be "huaraches" within the meaning of the Trade Agreement with Mexico, T.D. 50797, 78 Treas. Dec. 190, which provides, *eo nomine*, for a 10 percent ad valorem duty on huaraches under paragraph 1530(e) of the Tariff Act of 1930, and reads:

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for:
Huaraches_____ 10% ad valorem

The meaning of the word "huarache" has been previously considered by this court in *United States* v. *Weigert-Dagen, Weigert-Dagen Shoe Co., J. F. Goldkamp & Co.*, 39 CCPA 58, C.A.D. 464, and *United States* v. *Fuchs Shoe Corporation*, 41 CCPA 179, C.A.D. 547. The records in those cases have been incorporated herein together with additional evidence.

In *Weigert-Dagen*, this court on that record found that the word "huarache" was ambiguous and of doubtful meaning, and adopted the definition provided the negotiators of the Mexican Trade Agreement by the Tariff Commission. That definition reads:

---

[1] C.A.D. 772.
[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of Section 294(d), Title 28, United States Code.

Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

It then decided that none of the merchandise involved in *Weigert-Dagen* satisfied the quoted definition.

The *Fuchs* case involved merchandise stipulated to be "the same in all material respects" as that in *Weigert-Dagen*, and the evidence in the latter case was incorporated in the *Fuchs* record. After reviewing the new evidence the court interpreted "woven-leather" to mean "wholly woven," adhered to the definition in *Weigert-Dagen*, and held that the merchandise in *Fuchs* did not satisfy that definition.

Here the Customs Court correctly found that the merchandise does not differ in any material respect from one type involved in the *Fuchs* case, which was there held on that record not to be huaraches. That holding is not disputed here.

We agree with the following excerpt from the majority opinion below:

In view of the fact that the exhibits in the case at bar are basically the same in construction as exhibit 3 in the *Fuchs* case, and that the record in that case (which included the record in the *Weigert-Dagen* case) was incorporated as part of the record herein, it will be seen that the outcome of this case depends upon whether anything contained in the additional evidence offered in the case at bar does effect, or could effect, a conclusion as to the meaning of the term "huarache" different from that adopted in the *Weigert-Dagen* and *Fuchs* cases in the sense of including footwear such as that at bar.

Exhibits 1 and 2 are representative of the imported merchandise. They are identical in construction but differ in size and color combinations. They are both without heels. The toe portion or vamp consists of a piece of slitted leather interwoven with fourteen flat leather thongs which are laced to the insole. The back quarter or counter consists of a slitted piece of leather machine stitched to the insole. Four flat thongs are interlaced into and extend completely around the counter, are interwoven on each side of the shoe with some of the thongs of the vamp, and are laced to the insole. The insole is machine stitched to the outsole. Each exhibit has an instep leather strap and buckle.

It is incumbent upon us to evaluate the testimony in this case to endeavor to determine whether the imported footwear are "huaraches" within the meaning of the Trade Agreement irrespective of the conclusions reached in the two previous cases on their records.

The only witnesses called to testify were not contradicted in their statements that the merchandise at bar constituted huaraches. Of the three witnesses, one was an interested party, the plaintiff. The other two were not. All were well qualified to give expert testimony on the subject matter. For example, David L. Neumann, an importer of Mexican goods including huaraches, who qualified as an expert

on this subject, having written several articles about Mexican arts and crafts including one referring to the manufacture and importation of huaraches, unequivocally testified that the merchandise at bar constituted huaraches. He testified as follows:

X Q. Now, have you bought and sold huaraches in the United States?
A. Yes.
X Q. What type of merchandise have you bought and sold as huaraches in the United States?
A. In 1934 I made my first purchases of huaraches for importation to the United States, and sold them here in a retail store in Miami Beach, in Florida.
X Q. All right. Now describe the type, the appearance of that one.
A. We were at that time dealing primarily in two kinds of huaraches; one was the huarache which was made in Oaxaca and the other was purchased in Mazatlan and was identical with this little one on the table.
X Q. Identical with Exhibits 1 and 2?
A. That is right.

Most persuasive also is the testimony given by Joseph L. Kleinman, appraiser of merchandise, who has been in the Customs Service since 1923 as an inspector, entry clerk, liquidator and deputy collector. During this period he was located in the area of the southern border of the United States. Part of this testimony reads as follows:

Q. And, during all that period of time, have you become familiar with the merchandise that is imported at this area or through this area; through the port of El Paso or Nogales from Mexico?
A. I think so.
Q. Have you had occasion to pass upon, examine and appraise articles like Exhibits 1 and 2 in this case?
A. Yes.
Q. And, also like illustrative Exhibit D? [3]
A. Yes, sir.
Q. And, are you familiar with the area from which they come in Mexico?
A. To some extent, yes.
Q. How did you become familiar with that knowledge?
A. Handling the importations as examiner and appraiser, seeing the invoices, knowing where the shipments originated.
Q. Have you talked to importers and shippers as well?
A. Yes.
Q. Or just importers?
A. Importers and shippers.
Q. Now, looking at Illustrative Exhibit D, you are familiar with that item?
A. Yes, sir.
Q. Do you know what it is called?
A. What do you mean?
Q. What is the name given to you?
A. Huarache.
Q. Do you know what area it comes from?
A. Well, that is ordinarily known as Oaxaca huarache and Guadalajara.
Q. Guadalajara is one of the principal markets in Mexico for all kinds of huaraches?

[3] Exhibit D represents a type of sandal which presumably comes within the definition of a huarache contained in the Digests of the Trade Data.

A. Yes, sir.

Q. And, you can get Oaxaca and all other types there?

A. Yes, sir.

Q. I show you Exhibits 1 and 2 and ask you if you know where those came from?

\* \* \* \* \* \* \*

The Witness: They came from Mazatlan, Sinaloa, Mexico.

By Mr. Stein:

Q. Mr. Kleinman, have you received many or did you receive few such articles or huaraches from the same part of Mexico?

A. Many.

Q. Do you recognize these articles as a particular type which comes from Mazatlan?

A. Let me say this: that type is made in other parts of Mexico ; for instance, Guadalajara, but is generally known as the Mazatlan sandals.[4]

Q. Just as this is known as a Oaxaca, pointing to Exhibit D?

A. Yes.

Q. What is there about Exhibits 1 and 2 which identifies it to you as a Mazatlan huarache?

Miss Strum: I object. I don't think it is material to this case.

Judge Ford: Objection overruled.

The Witness: Construction and appearance.

By Mr. Stein:

Q. And, what is the construction—about the construction which distinguishes it to you as being from Mazatlan?

A. Instead of having a woven upper entirely, that it has a solid piece of leather as an upper through which narrow strips of leather are laced and laced to the insole also and the fact that it has a counter or heel piece through which leather strips are laced and that the leather heel piece or counter are stitched to the sole.

Q. You returned these, did you not, at 20 per cent under Paragraph 1530(e), did you not?

A. Yes.

Q. Did you do that on your own judgment or were you ordered to do that by the Bureau of Customs?

\* \* \* \* \* \* \*

The Witness: I'd have to add that it was a little of both. The Bureau of Customs instructed us, of course, but they also gave us a definition that would govern us in our decision as to what was a huarache and what was not a huarache and in interpreting that decision, I would have to say also that I would not consider it a huarache and would advisorily classify it at 20 per cent following that definition they gave us.

By Mr. Stein:

Q. According to your personal opinion, not regarding the instructions from the Bureau, do you regard Exhibits 1 and 2 as huaraches or not?

\* \* \* \* \* \* \*

---

[4] The testimony reveals that the word sandal is used at times to identify an huarache. One witness testified :

[Well, I would say that every huarache is a sandal in the broad meaning of the term, but not every sandal is a huarache.

The Witness: According to my opinion, these were what I would have called huaraches before we got any definition as to what constituted a huarache under the Mexican Trade Agreement.

＊ ＊ ＊ ＊ ＊ ＊ ＊

Mr. Stein:

Q. Let me put it this way, Mr. Kleinman, how long have you known articles like Exhibits 1 and 2 as huaraches?

Miss Strum: I object. I don't think he is qualified to give trade testimony.

Judge Ford: Objection overruled.

Miss Strum: Exception.

The Witness: Since somewhere around 1935; near that date.

＊ ＊ ＊ ＊ ＊ ＊ ＊

Q. Did you, Mr. Kleinman, advisorily classify articles like Exhibits 1 and 2 the same way as you did Illustrative Exhibit D prior to receipt of that definition?

Miss Strum: I object, your Honor. It is immaterial to this case.

Judge Ford: Objection overruled.

Miss Strum: Exception.

The Witness: Yes, because there was no difference prior to that; there was no difference. The term huaraches had never entered into the Tariff Act before that.

In appraising this witness' testimony, Judge Ford stated:

Undoubtedly the witness is one of the foremost witnesses on this subject throughout the United States. * * *

It is interesting to note that the Government offered no testimony to refute the uncontradicted statements made by this and the other witnesses. So it goes unchallenged.

It should be remembered we have been called upon to determine whether Exhibits 1 and 2 are huaraches within the purview of the Mexican Trade Agreement and not whether some other types of sandals come within this category. If other types of sandals are presented to us in the future, the determination of whether they come under the Trade Agreement should be made upon the basis of the facts of the case and whatever evidence may be offered at that time.

We believe the lower court summed up the situation correctly when it stated:

We think the evidence offered to us is clear, and moreover, uncontradicted, that the type of huarache described in the definition contained in the Digests of Trade Data is one associated with the place in Mexico called Guadalajara and that such huaraches are known as Oaxaca huaraches. Such a huarache was offered and received in evidence herein as defendant's illustrative exhibit D and is conceded by the parties to be a huarache. (It is interesting to note that, although the toe, or vamp, portion of illustrative exhibit D is wholly woven, it possesses a piece of slitted solid leather acting as a back or counter, through which some of the leather strips from the vamp are laced. The back or counter is not stitched to the sole, but if the back be considered part of the upper, as we assume it must, the upper of illustrative exhibit D is certainly not *wholly* woven.)

The evidence is just as clear and just as uncontradicted that footwear, such as plaintiff's collective exhibits 1 and 2, was, at and prior to the effective date of the Mexican Trade Agreement, commonly known in Mexico and in the United States as huaraches, and more particularly as Mazatlan huaraches, taking their name after the area in Mexico in which they were generally made. We accept such evidence as an aid to our understanding of the common meaning of the tariff term "huaraches."

We think we are justified in saying that had the evidence offered to us in this case been offered in the previous cases, a different conclusion would have been reached as to that portion of the subject merchandise which was of the same kind or type of footwear as is involved in this case, i.e., Mazatlan huaraches.

On the record before us, we hold that the common meaning of the term "huaraches" includes footwear of the kind or type described in the Digests of Trade Data, as set forth in the *Weigert-Dagen* and *Fuchs* cases, *supra*, and also includes footwear of the kind or type of plaintiff's collective exhibits 1 and 2 in this case, which have been hereinbefore described.

In view of the foregoing, we *affirm* the decision of the Customs Court.

———

WORLEY, C. J., with whom KIRKPATRICK, J., joins, dissenting.

If we are to follow the precedents of this court then we must agree with the Government that the majority below erred in overruling the collector's classification.

It is too well settled to require citation that when an importer challenges the collector's classification he must not only prove that classification wrong but also prove the claimed classification correct.

The footwear Taylor imported from Mexico was classified as shoes in chief value of leather n.s.p.f. There can be no doubt as to the accuracy of that description. If Taylor is to prevail he has the burden of not only proving that classification wrong, but also proving his own plea that they are "huaraches" right. Those burdens would be his even if this were a case of first impression. Inasmuch, however, as this court has on two previous occasions, in *Weigert-Dagen* and *Fuchs, both records incorporated here,* held that footwear which is agreed to be the same in all material respects as that at bar was not "huaraches," the principle of *stare decisis* is controlling unless the importer can prove "positive error" in those precedents. *Concord Watch Co., Inc.* v. *United States,* 46 CCPA 87, C.A.D. 703.

The only evidence relied on to discharge those burdens is Taylor's own testimony; that of another importer; a Customs official, and certain exhibits.

In evaluating that evidence it must be remembered that in *Weigert-Dagen* the word "huaraches" was held to be ambiguous, therefore what this court was seeking, and the importer trying to prove, was that "huaraches" had a *definite common meaning.* That is the basic

issue here. Despite the testimony in *Weigert-Dagen* of thirteen witnesses for the importer, all of whose qualifications as experts were equal if not superior to those here, this court found their testimony so inadequate and conflicting as to compel resort to and reliance on the Trade Digest definition.

That counsel for the importer here correctly recognizes the burden of proof resting on him is evident from the following:

Mr. Stein: Well, the reason for that, your Honor, is that the Government has tried several cases on huaraches at various ports, and until they did so we were satisfied with the testimony in our original case. But since we started this case other cases have been tried, one quite recently at St. Louis, in which Mr. Tompkins represented importers.

*The testimony seems to necessarily have to cover a wide area of the United States, because of the difficulty in ascertaining what is meant by "huaraches" in different parts of the United States.* Many of them have been imported at Boston, and we anticipate we may now have to also go to Boston after Los Angeles.

Judge Cline: Commercial designation then is the thing you are trying to prove here?

Mr. Stein: It is both. It is the *common and commercial designation.* It is an unusual situation because of that Trade Agreement, which inserted into the Act language which Congress never put in there. *So whether there is a common designation or a commercial designation, or whether both jibe and mean the same thing, becomes important. Consequently, we have to get the testimony now throughout the United States in order that the Government may not again try another case.*

Not only is there no evidence in the instant record of a common or commercial meaning throughout the United States, there is no real evidence from the three witnesses who did testify that huaraches have a definite common or commercial meaning even among themselves. Even if the testimony in *Weigert-Dagen* and *Fuchs* is completely ignored, which appears to be the situation here, the instant testimony is so vague in some respects, so contradictory and conflicting in others, as to be worthless in discharging what the importer's counsel correctly recognizes as his burden of proof.

The majority below did not point out just what testimony it relied on in support of its judgment. While the majority here quotes extensively from the testimony of one witness, it is necessary to review that of all three witnesses to show the conflict and extreme weakness of their testimony. Rather than risk a possible erroneous paraphrasing their testimony is quoted verbatim with the emphasis supplied.

This litigation began in 1945. It was Taylor himself who first took the stand. Even if he had no direct interest in obtaining a lower duty, and his testimony could be accorded the weight of that of a disinterested witness, it is still conflicting as is clearly shown by the following excerpts:

Q. In your opinion is Collective Exhibit 1 huaraches?

A. Yes.

Q. Why?

A. Because it is a leather sandal, woven of strips of leather, with thongs laced throughout the inner sole, although having a larger size outer sole. It is original footwear made by the native people of Mexico in small workshops; it doesn't have the finish or the fastening of a shoe; it has no instep or welt built into it. I think those are the principal points.

Q. Would you say that *all* huaraches such as you have been importing are *sandals?*

A. Well, yes, I would say so.

Q. What are the type of *sandals* with which you are acquainted?

A. Well, we have the "alpargata", a Spanish term primarily applied for a very simple type purchased largely in Argentina. There is the "chancla". Going back further, we have the "cactli" with the "nahutl" tongue, which is leather footwear produced from prehistoric time in Mexico; the Roman sandal; straw sandals.

Q. When you refer to huaraches, are you referring to a particular type of sandal or does that apply to more than one type of sandal? In other words, does the term "huaraches" apply to those you mentioned?

A. *I would not think so. I believe that all huaraches are sandals, but all sandals are not huaraches.*

Q. *What then would you say that the term "huaraches", as a type of sandal, be confined to?*

A. *It is almost a proprietary name, common or indigenous to Mexico. I would think it would have to be made in Mexico to be huaraches.*

Q. *Would you say that all huaraches would have to be exactly like Collective Exhibit 1 or would there be some variations?*

A. *Certainly there would be some variation.*

Q. *Would you give the court a description that is common to all huaraches?*

A. *Woven strips of leather with thongs which are fixed laces through the inner sole.*

Q. *Are they both colored and uncolored?*

A. *Both colored and uncolored and with high heel or low heel, loose heel or fastened heel, open toe and closed toe, and are commonly so known.*

Q. *How about the back; do they have both an open and closed back?*

Q. *They may have either an open or closed back. That is what I meant when I said either loose or fastened heel.*

 * * * * * * *

Q. Do you know of any other merchandise, or any other specific type of merchandise which is intended by that reference in the Mexican Trade Agreement, that is by the term "huaraches"?

A. Well, we *presume* it was a rather inclusive term that includes most types of peasants' sandals which *met the specifications of being woven of strips of leather with thongs laced through the inner sole and were either colored or uncolored.*

 * * * * * * *

## By Mr. Stein:

Q. Now, Mr. Taylor, would you say then that you have consistently referred to articles such as Collective Exhibits 1 and 2, which include the merchandise imported in this case, and that they are known throughout Mexico and here, so far as your personal experience goes, as huaraches?

A. Yes, sir. *I do not deny they are sandals but they are also huaraches.* An huarache is necessarily a sandal, itself.

Q. When you refer to an huarache, does it refer to a particular type of sandal?

A. Yes, sir.

Q. What type of sandal is it?

A. I can only repeat myself.

Q. I will ask you to repeat yourself after offering these illustrative exhibits.

A. *It is a leather sandal, woven of strips of leather. The thongs are fixed to the inner sole, and it has either a high heel or a low heel, or an open or closed toe.* * * *

\* \* \* \* \* \* \*

X Q. Have you looked in dictionaries or encyclopedia or anywhere else to ascertain what the word "huaraches" means?

A. *If I am not mistaken it did not mean anything in American lexicography until very recently. I am not sure it now appears, but I believe it does.*

\* \* \* \* \* \* \*

X Q. I understood you to say on direct examination that every huarache is a sandal, but not every sandal is a huarache; is that so? Or, was it vice versa that you said?

A. Well, I would say that every huarache is a sandal in the broad meaning of the term, but not every sandal is a huarache.

X Q. When you come to describe those sandals which are not huaraches and those which are huaraches, will you tell us what causes you to call one a huarache and another a sandal?

A. I will sort of repeat the definition I attempted to give a short time ago.

X Q. I believe you described a huarache as a woven article which includes a type of sandal. *Now, if it is a sandal when does the sandal cease to be a sandal and become a huarache, and when does a huarache cease to become a sandal?*

Mr. Stein: I object, if the court please. The question presumes a state of facts not shown to exist.

The witness has never made any such statement.

Judge Cole: Objection overruled.

Mr. Stein: Exception.

A. It is a little difficult to answer to the nth degree when it ceases to be a sandal and when it ceases to be a huarache but in the main a sandal would not cease to be a sandal but would be eligible to be a huarache *if* it were *woven* with *thongs of leather fastened to the sole* and *worn by people who have known them and always referred to them as huaraches in Mexico* where the term is indigenous by a class of people called Guadalajarians who have the craftmanship for making the huaraches. *When it has all of those factors, it is a huarache.* When it is a solid piece of leather and perhaps made up by people that do not recognize huaraches and come from some place where huaraches do not exist, I dare say it is not a huarache but merely a sandal.

\* \* \* \* \* \* \*

XQ. And it was because those poor peons had no other form of shoe or footwear that they called them huaraches?

A. Their use was confined to the poor people.

XQ. *How about their construction?*

A. *It varied.*

XQ. *Approximately how many?*

A. *Perhaps it would be quite a number.*

XQ. What do you mean by quite a number? I am talking about the huaraches that were purchased by the peons at three or seven pesos in Mexico, and not the kind of huaraches exported to the United States.

A. Practically every area of Mexico produces huaraches, but the production is limited for local consumption in three or four areas and each of those areas produce a different type of huarache. I can't say how many different types there are; there may be as many as two dozen.

XQ. If you will divorce your mind from the huaraches exported to the United States and just limit yourself to the huaraches sold in Mexico for those socalled peons that you described a little while ago, that you said were sold for three and seven pesos; limit your mind to that type of huaraches and tell me then whether the word "huaraches" originated or was created for the purpose of designating a very crude type of footwear consisting of one or two thongs and just a split piece of leather for the sole and heel.

A. I can answer that by saying that so far as I know since 1927 there has been no essential change in the type of weaving. The number of strips have been reduced by about twenty per cent but the basic principle is there just as it was in those days. There has been a change in the last; we give them an overlast that is more suitable to the American foot but there is no basic difference in weaving huaraches.

\* \* \* \* \* \* · \*

RQ. You don't call a *moccasin a huarache*?

A. No. Just because it is made in Mexico, we do not say it is a huarache.

RQ. *Is it your unqualified statement*, Mr. Taylor, *that all of the sandals imported or all of the merchandise imported on these invoices* before the court *in this case* and *in the other cases referred to by counsel* on this calendar, that they are *all huaraches?*

A. Yes, sir.

Re-cross-examination

By Mr. Spector:

RXQ. In other words, you would call them huaraches, is that it?

A. I do call them huaraches.

RXQ. *There may be a difference of opinion between you and someone else as to what is a huarache and what is a sandal?*

A. *Oh, yes, doubtless.*

Taylor's testimony obviously fails to establish a definite meaning of the word "huaraches." After all, it is that meaning, not "sandals" which we are seeking and which the importer is attempting to prove. Moreover, Taylor declares that huarache uppers must be "woven strips of leather." The footwear at bar is not of such construction and, therefore, does not fit his own definition.

The second witness, Neumann, is also an importer of Mexican goods which included the type at bar until 1942, after which time he frequently sold on a commission basis. He testified in 1947. Even if his testimony can be considered wholly disinterested, it is even broader, more vague and contradictory than Taylor's, as clearly evident from the following:

Q. \* \* \* What does a huarache mean to you from the American point of view?

A. *A piece of footwear identified in the United States certainly as of Mexican origin, commonly used for informal and sports wear.*

Q. Well, aren't there also huaraches made in the United States, Mr. Neumann?

A. I believe they are not, and I think I know why.

Q. Well, would you tell us why?

A. I believe that it has come out in various experiences which I have been acquainted with in the past that *the weaving of the upper of this particular piece* of footwear—

Q. *You mean Exhibits 1 and 2?*

A. That is right, either or both of them—is of such a nature that if they were to be made in this country the cost would be too high, and I believe they are not produced here.

Q. In other words, you claim that Exhibits 1 and 2 are not of the character of huaraches made in the United States, *or that there are no huaraches made in the United States?*

A. I would say the latter.

Q. The latter?

A. I would say the latter.

Q. *Well, isn't it a fact that they do offer for sale certain types of footwear in the United States, made in the United States, which they do call huaraches?*

A. *Not to my knowledge. I have seen them described under the commercial term of Koolaches.*

Q. Spell that, please.

A. That is a trade name—I believe is K-o-o-l-a-c-h-e-s, and is a fairly costly shoe, like a sandal.

\*　　\*　　\*　　\*　　\*　　\*　　\*

By Mr. Stein:

Q. Mr. Neumann, in order to be a huarache as you understand it what must the article consist of?

A. *I would say that a huarache, in my opinion, would be from Mexico, firstly, since that is where the term is used and originated and was borrowed by us; and secondly, that it would be characteristic of the footwear of the lower classes, indito.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. *Now, would it make any difference, according to your experience and in your opinion, whether the huaraches had the soles nailed or sewed all around or partially around?*

A. *No, none whatever.*

Q. *Would it make any difference whether they had a back to them attached to the sole or whether it was merely a strap to be applied to the back of the foot, as in Illustrative Exhibit D?*

A. *No difference whatever.*

Q. *They would all be huaraches, in your opinion?*

A. *They could be. It would depend. It might vary from a huarache in some other particular.*

Q. *Well, in what particular have you in mind?*

A. *I will have to return to my general feeling, that the nature of huaraches is not determined by the detail of its construction, but by habits of use and its origin.* There are many kinds of footwear in Mexico, *including sandals made with a piece of rubber tire for a sole, which is certainly a huarache and has no characteristic of other shoes which are also certainly huaraches, but it is used by the poor people in their habit of life.*

Q. You mean it would not have the characteristics of Exhibits 1 and 2?

A. *Wholly different.*

Q. Would that be because of the sole or because of the upper, or both?

A. *The upper consists of only a couple of narrow straps, or it is quite different, and the sole being a piece of an old automobile tire, it is still very* different, *still it is a huarache and nothing else,* in my opinion.

Q. Well, then what, in your opinion, or what is your understanding of the meaning of huarache?

A. *My own opinion is that it is a Mexican sandal, period.*

Again it must be remembered that what we are seeking and the importer trying to prove is a definite and common meaning of "huaraches," not "sandals." To Neumann "huaraches" are "Mexican sandals," whatever that means. The tariff provisions is "huaraches" and to merely say that they are "sandals" is to ignore the issue. To Neumann construction is irrelevant, but to Taylor essential; to Neumann "huaraches" can be made of rubber tires, but to Taylor they must be made of leather and woven in a particular manner. Incidentally, the Neumann article which was introduced "to establish the qualifications of the witness" has a single sentence dealing with huaraches and reads: "*Huaraches* are entirely hand made, with the exception of the sewing of the outsole to the innersole, which is done on a modern shoe stitching machine." It is impossible to reconcile their testimony to in any wise establish a definite meaning of "huaraches."

Kleinman's qualifications as an *expert* on huaraches are the weakest of the lot. At least Taylor and Neumann have had actual experience in the trade but Kleinman none. His "qualifications" seem to be based on his varied duties as a Customs official since 1923, during which time he presumably came into contact with many different kinds of imports. The record provides no support for assuming he would be an expert on huaraches any more than on any other imports. Quite the contrary, he testified that he had dealt with Mexican imports "infrequently." He did not say that he had ever visited the areas from which the instant articles emanated, but "thought" he was familiar with those areas "to some extent" because:

Q. How did you become familiar with that knowledge?

A. Handling the importations as examiner and appraiser, seeing the invoices, knowing where the shipment originated.

Q. Have you *talked* to importers and shippers as well?

A. Yes.

Q. Or just importers?

A. Importers and shippers.

That testimony is clearly subject to the same valid objection as "hearsay evidence" raised by importer's counsel in *Weigert-Dagen* to the testimony of one McDaniel, another Customs official of even longer experience than Kleinman who classified the footwear in *Weigert-*

*Dagen* and testified therein. Kleinman's testimony not only conflicts with that of Taylor and Neumann but with that of McDaniel as well.

That Kleinman's qualifications as a witness were repeatedly challenged by Government counsel is evident from the following:

Q. I show you exhibits 1 and 2 and ask you if you know where those came from?

Miss Strum: I object, your Honor. This witness should not be testifying in this manner. In the first place, *he said he only made infrequent dealings with the merchandise.* We will concede that he has handled some as examiner and appraiser. *To try to obtain testimony from this witness which is actually trade testimony should not be admissible.*

Mr. Stein: If the Court please, in the cases to which Government counsel referred, which she wanted to incorporate, the Government called as a witness the appraiser of merchandise at Laredo, [McDaniel] who testified to trade dealings and names and everything else in the case and they have done it also. Where an appraiser becomes familiar with merchandise as an appraiser or as an examiner, I think he is fully qualified by reason of the knowledge that he attains as such to testify as to the trade meaning, the trade dealings and everything about the merchandise.

Miss Strum: Your Honor, it is well known in the Customs Court when Government calls an examiner or an appraiser, we are greatly limited as to what the man can say. *The importer's attorney have always contended that the appraisers are not in the trade and cannot testify about trade knowledge and the Court has always upheld the importer's objections.* If Mr. Stein has such testimony available from trade witnesses and this record already has trade testimony in it, I see no reason for calling the appraiser at this port to try to offer testimony to overturn a Court of Appeals decision.

Mr. Stein: We are not concerned with the Court of Appeals decision except by reference, your Honor, so far, and the appraiser has personal knowledge of these situations with respect to this situation.

Judge Ford: *Unless he has personally visited these plants, unless he has personally seen this merchandise, how it's made in various sections of Mexico, I doubt if he can qualify as a trade expert.*

That the trial judge also questioned Kleinman's qualifications as a trade expert is amply demonstrated by the above. In that connection it should be remembered that in *Weigert-Dagen* Government counsel *conceded* that McDaniel's testimony was not that of a trade expert.

Kleinman's testimony with reference to the footwear at bar is of particular interest:

Q. Do you recognize these articles as a particular type which come from Mazatlan?

A. Let me say this: that type is made in other parts of Mexico; for instance, Guadalajara, *but is generally known as the Mazatlan sandals.*

Q. Just as this is known as a Oaxaca, pointing to Exhibit D?

A. Yes.

Q. What is there about Exhibits 1 and 2 which identifies it to you as a Mazatlan huarache?

Miss Strum: I object. I don't think it is material to this case.

Judge Ford: Objection overruled.

The Witness: *Construction* and *appearance.*

Thus, although Kleinman says in one breath that one type of the footwear at bar is "*generally known* as the *Mazatlan sandals*," in the next breath he says that he himself calls them "huaraches." Which are we to believe? To refer to Kleinman as a foremost witness, whatever that might mean, obviously has no support in the record. On the contrary, the record in *Weigert-Dagen* shows that in 1943 Kleinman's views on huaraches clashed with those of another Customs appraiser. That dispute was settled by the Commissioner of Customs who ruled against Kleinman. It thus appears that Kleinman's qualifications as an expert on "huaraches" are not regarded so highly by his superiors as by the majority here. Even according Kleinman's testimony full weight as a disinterested Customs official, his lack of qualification is so obvious as to be of no help in arriving at a definite meaning of huaraches.

It is hard to understand what the majority means in saying the testimony of the instant witnesses goes unchallenged. The record shows that the testimony was repeatedly, vigorously, and successfully challenged by Government counsel on cross-examination. In addition, it must be remembered that the record in *Weigert-Dagen* is *incorporated here*. That record is replete with testimony conflicting with that here. I do not understand why that testimony is not discussed by the majority and is not accorded equal weight with that at bar. There can be no doubt that a proper evaluation of the evidence in both cases would unquestionably support a conclusion directly opposite to that reached by the majority here.

To repeat, Taylor's testimony conflicts with Neumann's, Neumann's with Kleinman's, Kleinman's with McDaniel's, and all with each other. How they can testify that the articles at bar are "huaraches" without knowing what "huaraches" are is indeed puzzling.

Even if *Weigert-Dagen* and *Fuchs* are completely ignored, to accept the present record as sufficient to discharge the importer's burden is to lower our standards to an unprecedented level and disturb, if, indeed, not overrule, settled law. I agree with the dissenting judge below and would reverse. 